| | | |
|---|---|---|
| Clarence Dale Maurer, | ) | Civil Action No. 5:18-cv-0240-KDW |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Nancy A. Berryhill, Acting | ) | ORDER |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local Civil

Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's petition

for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial

review of a final decision the Commissioner of Social Security ("Commissioner"), denying his

claim for Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act").

Having carefully considered the parties' submissions and the applicable law, the court affirms the

Commissioner's decision for the reasons discussed herein.

I.      Relevant Background

    A.      Procedural History

On May 15, 2014,[1] Plaintiff protectively filed for SSI under Title XVI of the Act, alleging a

disability onset date of January 1, 2003. Tr. 178-86. After being denied initially, Tr. 104, and upon

reconsideration, Tr. 115, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"),

Tr. 129-30. The ALJ conducted a hearing on September 9, 2016, taking testimony from Plaintiff

and Vocational Expert ("VE") Carroll Crawford. Tr. 45-93. Representing Plaintiff at that hearing

was his attorney, W. Grady Jordan. Tr. 45. The ALJ denied Plaintiff's claim in a decision dated

February 13, 2017. Tr. 16-39. Plaintiff requested review of this decision from the Appeals Council,

---

[1] Although the Application Summary is dated May 23, 2014, Tr. 178, Plaintiff's protected filing

Tr. 172, which denied his request on December 15, 2017, Tr. 1-6, making the ALJ's February 2017 decision the Commissioner's final decision for purposes of judicial review. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed January 30, 2018. ECF No. 1.

B.      Plaintiff's Background

Plaintiff was born in April 1972 and was 42 years old when he filed his application for SSI on May 15, 2014, and 30 years old as of alleged onset date of January 1, 2003. Tr. 209. In his form Disability Report-Adult dated May 23, 2014, Plaintiff indicated he completed the eighth grade, did not attend special education classes,[2] and did not complete any specialized job training, trade, or vocational school. Tr. 214. He listed his past relevant work ("PRW") as production/light industrial, restaurant cook, and carpet cleaner. *Id.* Plaintiff indicated he stopped working on January 1, 2003 because of his medical conditions that he described as diastasis,[3] hypertension, and herniated disc in back. Tr. 213. Plaintiff indicated he was 5'8" tall and weighed 350 pounds. *Id.* In a Disability Report-Appeal dated December 12, 2014, Plaintiff indicated a change in his condition noting that since September 1, 2014 he was being treated for breakouts of yeast on his legs. Tr. 233. Plaintiff indicated that he "hurt continuously" but that he was "able to take care of most personal needs, showering, etc." Tr. 236. Regarding changes to his daily activities Plaintiff indicated: "Not able to walk hardly at all anymore." *Id.* In the "Remarks" section of the report Plaintiff indicated that his "belly hurts all the time; like a constant belly ache. I'm not supposed to lift anything over a pound." Tr. 237.

---

date as referenced in the Disability Determination and Transmittal is May 15, 2014, Tr. 104.
[2] At the administrative hearing Plaintiff testified that he was in special education classes "all through elementary and middle" school. Tr. 61.
[3] Diastasis recti or abdominal separation means that the "belly sticks out because the space between your left and right belly muscles has widened." *See* https://www.webmd.com/baby/guide/

C.    Administrative Proceedings

On September 9, 2016, Plaintiff appeared with counsel at an administrative hearing in Greenville, South Carolina and testified regarding his application for SSI. Tr. 45. VE Carroll Crawford also appeared and testified at the hearing. *Id.*

1.    Plaintiff's Testimony

In response to questions from the ALJ Plaintiff testified that since 2014 he lives alone in a mobile home; prior to that he lived with his wife and one child. Tr. 53. Plaintiff stated that his father owns the mobile home, so he does not have to pay rent. Tr. 54. Plaintiff testified that he completed the seventh grade and left school in the eighth grade. *Id.* Plaintiff stated that he failed the third grade and that was when his "mother died at a young age and everything got on a haywire." *Id.* Plaintiff stated that his last job was working full-time for Ampro as a screwing machine operator. *Id.* Plaintiff stated that prior to that he worked for four or five months as a grill cook for Krystal in 2007 or 2008 before they closed. Tr. 55. Plaintiff also reported doing carpet installation in 1999 or 2000 in Myrtle Beach. *Id.* Plaintiff testified that his driver's license was reinstated in 2006, and when he was working for Ampro his girlfriend drove him back and forth to work. Tr. 56.

In response to questions from his attorney, Plaintiff testified that it took him three times to pass the written test for his driver's license. Tr. 56. Plaintiff stated that the first time the test was read to him and he failed it, the second time he tried to read it on his own and he failed it, and the third time his sister went through the driving book with him and he was able to pass the test. Tr. 56-57. Plaintiff testified that he does not read "real good" and he can print but he cannot write in cursive. Tr. 57. Plaintiff also remarked that most of the things that he writes are not spelled correctly because he "can't spell." *Id.* Plaintiff confirmed that although he started, he did not finish

abdominal-separation-diastasis-recti#1 (last visited Feb. 20, 2019).

3

the seventh grade, and the last grade he completed was the sixth grade. Tr. 57-58. There was some discussion about what grade Plaintiff actually completed in school as there is information in the record that indicated Plaintiff completed the eighth grade. Plaintiff acknowledged that his sister helped him complete the online Social Security forms, but he was unable to recall what grade he completed. Tr. 58-61. Plaintiff testified that he was in special education classes throughout elementary and middle school. Tr. 61.

The ALJ asked Plaintiff why he left school and Plaintiff testified that his family broke up when his mother died. Tr. 62. The ALJ asked for clarification as Plaintiff's prior testimony was that he failed the third grade when his mother died. Plaintiff testified that his mother died in 1984 when he was 12 years old, but he did fail the third grade. *Id.*

In response to questions from his attorney Plaintiff testified that he had email on his phone that was set up by the telephone company but that he never used it. Tr. 62. Counsel asked about a notation in the record where Plaintiff was seeking assistance because he was taking care of his disabled wife and child. Tr. 63. Plaintiff testified that he divorced in 2014 but when he was married his wife did the cleaning, cooking, and shopping, along with Plaintiff's father. *Id.* Plaintiff testified that his wife "really took care of herself" but that he sometimes had to provide wound care related to recurring staph infections. Tr. 64. Plaintiff testified that since his divorce he spent time with his daughter on the weekends, but she had been unable to visit on the weekends lately because of the distance between where they lived. Tr. 65.

Plaintiff stated that his last job ended when the company moved and after that he "really started having problems with [his] stomach." Tr. 65. Plaintiff testified that he did not go to the doctor because he did not have insurance. *Id.* Plaintiff testified that he thought he had an ulcer, so he was taking over-the-counter medications and was looking for work. Tr. 66. Plaintiff stated that "as

the months went by, the pain progressed and it just kept on and kept on and kept on." *Id.* Plaintiff stated that he went to a doctor who wanted to do an endoscopy, but Plaintiff was afraid and did not want it done. *Id.* Plaintiff testified that at that time he did not have a family doctor and did not have health insurance, so when he went to the doctor he paid out of pocket. Tr. 67. Plaintiff stated that he went to the emergency room ("ER") multiple times related to his stomach pain and the ER referred him to a stomach specialist. Tr. 67-68. Plaintiff stated that he was eventually given a hospital sponsorship so that he could go to the doctor, but it expires every year. Tr. 68.

Plaintiff testified that he has chronic yeast infections in his rectal area that cause extreme itching and doctors have not been able to give him any medication to take the yeast away. Tr. 69. Plaintiff testified that he is currently using a cream that helps some with the itching. Tr. 70. Plaintiff stated that if he gets hot and sweaty the itching increases and "it washes the medicine off and it will just itch." Tr. 71. Plaintiff testified that his stomach never stops hurting and certain movements will cause his stomach to push out due to a rupture in the wall. *Id.* Plaintiff stated that sitting back or standing too long will cause pain. He also testified that he sleeps for only an hour or so at a time because when he tries to turn over his stomach bulges. Tr. 72. Plaintiff stated that bending down is "not impossible but it hurts real bad." *Id.* Plaintiff stated that he uses a heating pad to help with the pain and takes the medications Norco and gabapentin. Tr. 72-73. Plaintiff testified that he does not have any side effects from the Norco, but the gabapentin makes him "feel drunk." Tr. 73.

Plaintiff stated that he spends most of the day sitting on the couch watching TV. Tr. 74. Plaintiff stated that his father cooks or brings him something to eat, and his sister visits twice a week and she cooks and cleans. Tr. 74-75. Plaintiff stated that his father does the grocery shopping and sometimes his sister will go to Walmart for him. Tr. 75. Plaintiff stated that sometimes he will accompany his father grocery shopping and will use a motorized cart because he cannot walk very

long without being "in excruciating pain." Tr. 76. Plaintiff stated that he can do laundry if his father or sister move the clothes from the washer to dryer. He stated that bending into the washing machine pushes against his stomach, but he is able to take the clothes from the dryer and fold them. *Id.* Plaintiff stated he does not do any yardwork and his father hires someone to do the yardwork for all the property his father owns. Tr. 77. Plaintiff confirmed that he used to ride motorcycles but stopped riding in the '90s. *Id.* Plaintiff stated that he plays Xbox games on the weekends with his nephew. Tr. 77-78. Plaintiff stated that he can shower but he is unable to get in and out of the bathtub. He testified that he can dress himself, but he does not tie his shoes. Tr. 78. Plaintiff stated that he can walk for five minutes but after that his stomach cramps and his legs hurt. *Id.* Plaintiff stated that he could sit comfortably for about an hour. Tr. 79. He stated that if he leaned against something he could stand for ten minutes, but if he had to stand up straight he could stand for only five minutes before he started hurting. Tr. 80. Plaintiff testified that the heaviest thing he could lift would be a half-gallon of milk—anything heavier makes his stomach hurt. *Id.*

Plaintiff testified that he has a Facebook account that was set up by his sister and he uses it every day. Tr. 81. Plaintiff remarked: "I'm not dead. I'm hurting." *Id.* Plaintiff stated that he has two discs in his back that have "come out of their place and they pinch [his] sciatica nerve." *Id.* Plaintiff stated that he has constant pain in his back and legs. *Id.* Plaintiff testified that last year he was given an epidural nerve block that helped, but it lasted only a month. Tr. 81-82. Plaintiff stated that he was 5'8" tall and weighed 362 pounds. Tr. 82. When asked if he would know if he was given the correct change Plaintiff stated that he does not count his change but if he had to count it he would "have to lay it down to count it." Tr. 82-83. Plaintiff testified that he is "up three or four times a night using the bathroom" but he does not have to go as often during the day. Tr. 83. Plaintiff testified that he sleeps in intervals of an hour or hour-and-a-half at a time. *Id.* Plaintiff

stated that he is unable to sleep during the day. *Id.* Plaintiff testified that he has tried to lose weight but with the amount of food stamps that he gets he is unable to eat right because the healthy food is higher priced. Tr. 83-84. Plaintiff stated that although his father cooks for him, his father "eats weird" so they do not eat the same meals. Tr. 84. Plaintiff stated that he eats at McDonald's twice a week. Tr. 85. Plaintiff stated that he has not been to the movies in years, he does not go on vacation, and although he is a member of a church he has not been to church service in about four months. Tr. 85. Plaintiff testified that he does not go to visit friends, but they will come to see him. *Id.* Plaintiff testified that with his medicine, and if he is not doing anything, he would describe his stomach pain as a 5 on a scale of 1-to-10; without his medicine it would be an 8. Tr. 86. Plaintiff stated that if he is on his medicine and he makes a movement that causes his stomach to hurt, the pain will go from a 5 to a 7 or 8. *Id.* Plaintiff testified that he does not take illegal drugs and he does not take anyone else's medication. Tr. 87. Plaintiff stated that since he has been seeing the pain management doctors he has not had to go to the ER other than when he had pneumonia earlier in the year. *Id.*

2.      VE's Testimony

The VE identified Plaintiff's PRW as a screw machine operator as medium and skilled with SVP 5, and Dictionary of Occupational Titles ("DOT") number 604.382-014. Tr. 88. The ALJ asked the VE to assume "a hypothetical individual of a younger age with a limited education and past relevant work as a screw machine operator." Tr. 89. The ALJ posed the following Hypothetical Number 1:

> [I]n the course of an eight-hour workday in two-hour increments with normal and acceptable work breaks this person could perform work at the sedentary exertional level as defined in the rules and regulations. This person can never climb ladders, ropes, and scaffolds. This person can occasionally climb ramps and stairs, kneel, crouch, and crawl. This person can occasionally stoop and lift within the exertional level from floor to waist, but can frequently stoop and lift within the exertional level from waist height and above. This person can frequently balance. This person can occasionally be exposed to extreme cold, extreme heat, wetness, and hazards that we

would associate with unprotected dangerous machinery or unprotected heights. This person has sufficient concentration in persistence and pace to understand, remember, and carry out simple routine tasks in a low stress work environment that we will define as being free of fast paced or key dependent production requirements involving simple work-related decisions and occasional independent judgment skills and occasional workplace changes.

Tr. 89. The VE confirmed that Plaintiff's PRW could not be performed but that other unskilled sedentary jobs would be available and identified the following: assembler, sedentary and unskilled with SVP:2, DOT number 734.687-018, 350,000 jobs in the United States; bench hand worker, sedentary and unskilled with SVP:2, DOT number 715.684-026, 84,000 in the United States; weight tester in a laboratory setting, sedentary, unskilled with SVP:2, DOT number 539.485-010, 90,000 in the United States. Tr. 89-90.

The ALJ's Hypothetical Number 2 added the limitation to Hypothetical Number 1 that the "person is also further limited to jobs that require very little literacy skills." Tr. 90. The ALJ asked if there was work that could be performed and the VE responded that the same representative jobs from the first hypothetical would be available. *Id.* For Hypothetical Number 3 the ALJ added two more limitations related to time off task and absenteeism as follows:

So in addition to the limitations set forth, this person could maintain that concentration, persistence, and pace for 75 percent of the workday. Now, this could be . . . mental or physical, but the end result would be that they would be off task for an average of 25 percent of the workday beyond normal work breaks. Additionally, the person would also be absent from work an average of three or more days per month.

Tr. 91. The ALJ asked if there was any work that could be performed with those limitations and the VE responded in the negative and noted that "off task or absences, either one would eliminate full-time work in my opinion." *Id.* The VE noted that his answer was based on his experience of dealing with employers as the DOT does not address the issue. *Id.*

Plaintiff's counsel asked if there would be any jobs if "an individual is limited to less than two hours sitting in an eight-hour day and less than a total of two standing and walking in an eight-hour day"; the VE responded in the negative. Tr. 92. Counsel had no further questions for the VE. *Id.*

The ALJ indicated that he would consider whether to send Plaintiff out for a mental consultative examination or for literacy testing but indicated that he was putting the case on hold for two weeks to allow Plaintiff to supplement the file with additional records. Tr. 92-93.

II.     Discussion

A.     The ALJ's Findings

In his February 13, 2017 decision, the ALJ made the following findings of fact and conclusions of law:

> 1.     The claimant has not engaged in substantial gainful activity since May 15, 2014, the application date (20 CFR 416.971 *et seq.*).
>
> 2.     The claimant has the following severe impairments: spinal disorder, diastasis recti/ventral hernia, obesity, right knee degenerative joint disease, candida infection, and learning disability (20 CFR 416.920(c)).
>
> 3.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).
>
> 4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to over the course of an eight-hour workday, in two-hour increments with normal and acceptable work breaks perform sedentary work as defined in 20 CFR 416.967(a) except can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, kneel, crouch, and crawl; can occasionally stoop to lift within the exertional level from floor to waist, but can frequently stoop to lift within the exertional level from waist height and above; can frequently balance; can occasionally be exposed to extreme cold, extreme heat, wetness, and hazards associated with unprotected

dangerous machinery or unprotected heights; has sufficient concentration, persistence, and pace to understand, remember, and carry out simple, routine tasks in a low stress work environment (defined as being free of fast-paced or team-dependent production requirements), involving simple work related decisions, occasional independent judgment skills, and occasional workplace changes; limited to jobs that require very little literacy skills.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on April 1, 1972 and was 42 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.      The claimant has not been under a disability, as defined in the Social Security Act, since May 15, 2014, the date the application was filed (20 CFR. 416.920(g)).

Tr. 21-22, 24-25, 37-39.

B.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability,"

defined as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish the inability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *See Vitek*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.    Analysis

Plaintiff alleges that the ALJ erred in (1) "failing to provide logical reasons for discounting the opinion of the consultative evaluator" and (2) "not giving proper weight to the opinion of the treating physician." Pl.'s Br. 2, ECF No. 15. The Commissioner submits that substantial evidence supports the ALJ's decision, the ALJ properly considered the consultative examiner's opinion and the opinion of Plaintiff's treating physician. Def.'s Br. 3-5, ECF No. 16.

1.    ALJ's Consideration of the Consultative Examiner's Opinion

Plaintiff argues that the ALJ did not provide logical reasons for discounting the opinion of the consultative examiner, noting that he "sent Plaintiff out for a one-time consultative evaluation without providing medical records and then discounted the opinion because it was a one-time evaluation without the provision of medical records." Pl.'s Br. 5. The Commissioner notes that

Consultative Examiner Robin L. Moody, Ph.D. ("Dr. Moody") opined that Plaintiff needed assistance due to his physical limitations and not due to his alleged mental impairments and that opinion was consistent with Plaintiff's statement that he could not work due to his physical issues. Def.'s Br. 5. Defendant argues that "consistent with the evidence, Dr. Moody's findings, and Plaintiff's statement, the ALJ properly did not afford more weight to Dr. Moody's opinion that Plaintiff could not carry out simple instructions." *Id.*

At the administrative hearing Plaintiff's counsel requested a mental consultative evaluation. Tr. 50. Counsel indicated that he had tried but was unsuccessful in obtaining Plaintiff's school records but thought that if Plaintiff's IQ testing was at a certain level it might show that "he could potentially meet a listing as far as the functioning and his condition." *Id.* The ALJ questioned whether it would be necessary for the Social Security Administration to do the testing if Plaintiff had gone to vocational rehabilitation after his last job ended and they performed that kind of testing. Tr. 50-51. At the end of the hearing the ALJ stated that he would give further consideration as to whether he would send Plaintiff "out for a mental CE or if he needs literacy testing." Tr. 92.

Fifteen weeks after the administrative hearing, on December 20, 2016, Robin L. Moody, Ph.D. conducted a comprehensive clinical evaluation of Plaintiff and submitted her report. Tr. 583-92. Dr. Moody indicated that she administered the Mini-Mental State Examination-Second Edition (MMSE-2), the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV), and the Wide Range Achievement Test-Fourth Edition (WRAT-4); conducted a clinical interview; and reviewed a 1985 School Psychologist Report. Tr. 583. She noted that Plaintiff was "applying for disability due to a history of learning disabilities" but quoted Plaintiff as stating that he was applying for disability due to a mass in his stomach, diastasis, and the need for back surgery. *Id.* On the WAIS-IV Plaintiff scored 66 in verbal comprehension and working memory, 71 in perceptual reasoning, 59 in

processing speed, with a full-scale IQ score of 60 described as "very deficient." Tr. 587. In her conclusion Dr. Moody noted:

> His ability to reason with and without words was comparable and within the extremely low range. His ability to maintain concentration and attention was also very poor and only better than 1% of individuals his same age. His ability to process routine visual information without making errors was also very poor. Likewise, his achievement scores were all extremely low and consistent with his IQ scores.

Tr. 588. Dr. Moody noted Plaintiff's prior test results from 1981 and 1985 and found that his present scores were consistent with his 1981 scores, but his 1985 scores were slightly higher. *Id.* Dr. Moody diagnosed Plaintiff with "Intellectual Disability (mild)." *Id.* In her Clinical Functional Assessment she noted that Plaintiff's "concentration, pace and persistence is poor. He cannot carry out simple instructions." Tr. 589. She also found him incapable of managing his own funds and he did not appear to exaggerate his symptoms. *Id.*

The ALJ considered Dr. Moody's opinion and gave it "some weight." Tr. 36. The ALJ explained:

> Some weight can be given based on Dr. Moody's specialized examining with a comprehensive mental evaluation. Greater weight cannot be given due to the lack of a longitudinal history and the claimant's heavy reliance on the claimant's one-time presentation. Dr. Moody did not review the longitudinal history, only being provided with a 1985 school psychologist report. In particular, the claimant's work history shows the claimant was able to work a skilled Specific Vocational Preparation five level job for five years.[5] This greatly contradicts Dr. Moody's assertion that the claimant could not carry out simple instructions. Furthermore, the claimant's need for assistance appeared to primarily be related to his physical problems. Otherwise, the claimant had a history of living alone and independently. Additionally, the claimant was attentive and articulate at the hearing. Thus, Dr. Moody's opinion is given only some weight.

Tr. 36.

---

[5] In his Reply Brief Plaintiff notes that he performed this job for six months and not five years and it was not a skilled job as he performed it. Pl.'s Reply, ECF No. 17.

"Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 416.927(a)(1).[6] The responsibility for weighing evidence falls on the Commissioner, not the reviewing court. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "An ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies,' or has not given good reason for the weight afforded a particular opinion." *Koonce v. Apfel,* No. 98–1144, 1999 WL 7864, at *2 (4th Cir. Jan. 11, 1999) (per curiam) (unpublished) (internal citation & quotation omitted). Generally, more weight is given to medical opinions from treating sources than from reports of individual examinations such as consultative examinations. 20 C.F.R. § 416.927(c)(2). Here, the ALJ stated that he "considered opinion evidence in accordance with the requirements of 20 CFR 416.927." Tr. 25.

At steps two and three of the sequential evaluation process the ALJ found Plaintiff had the severe impairment of learning disability but determined that his mental impairment did not meet or medically equal the requirements of Listing 12.05. Tr. 21-23. The ALJ found that Plaintiff did not meet the Paragraph A criteria of the Listing because he "does not have significant subaverage general intellectual functioning currently manifested by an inability to participate in standardized testing of intellectual functioning and significant deficits in adaptive functioning currently manifested by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing), dating to before attainment of age 22." Tr. 23. Regarding the Paragraph B criteria, the ALJ

---

[6] For claims filed on or after March 27, 2017, the regulations changed as to how adjudicators would consider and articulate medical opinions. *See* 20 C.F.R. § 416.920c. Because Plaintiff's claim was filed prior to March 27, 2017, 20 C.F.R. § 416.927 is applicable.

determined that Plaintiff had moderate limitation in understanding, remembering, or applying information noting that Plaintiff reported being functionally illiterate. *Id.* The ALJ found Plaintiff had mild limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace; and moderate limitation in adapting or managing oneself. Tr. 23-24. The ALJ also noted that "no state agency psychological consultant concluded that a mental listing is medically equaled." Tr. 24. In describing the record evidence related to Plaintiff's learning disability impairment the ALJ noted Plaintiff's hearing testimony regarding his functioning, Tr. 26; his school records and test scores, Tr. 27 and 33; and Plaintiff's self-reporting regarding his abilities to a physician's assistant in 2014, Tr. 33.

While the ALJ was required to evaluate Dr. Moody's opinion, because she was not Plaintiff's treating physician her opinion was not entitled to controlling weight. 20 C.F.R. § 416.927(c). Plaintiff contends the ALJ's reasons for discounting the opinion—that it was a one-time opinion and done without the provision of medical records—were not based on logic and were "simply specious." Pl.'s Br. 5. The undersigned disagrees. At the administrative hearing Plaintiff's counsel noted that he had been unable to obtain Plaintiff's school records and requested the ALJ schedule a consultative examination so that Plaintiff could get IQ testing. Tr. 50. Dr. Moody indicated the only record she reviewed was a school psychologist's report from 1985. Tr. 583. However, Dr. Moody also references Plaintiff's test scores from 1981. Tr. 588. These scores were part of a 1981 school psychologist's report contained in Exhibit 14F—the same exhibit that contained the 1985 report, Tr. 505-07, and the only school-related records in the file. While it is true that he ALJ noted that he could not give greater weight to Dr. Moody's opinion due to the lack of a longitudinal history—according to Plaintiff's counsel and based on the information in the record—a more in-depth history of Plaintiff's education and testing is unavailable. Furthermore,

Plaintiff contends that "Dr. Moody was provided with everything she needed to render her opinions: she had prior test results which are consistent with her own results." Pl.'s Br. 7.

The ALJ is required to evaluate all medical opinions. 20 C.F.R. § 416.927(c). However, the responsibility for weighing the evidence falls on the ALJ, not the reviewing court. *See Craig v. Chater*, 76 F.3d at 589. Dr. Moody assessed Plaintiff with poor concentration, pace, and persistence and opined that he was unable to carry out simple instructions. Tr. 589. In discounting her opinion, the ALJ not only considered the lack of a longitudinal record and one-time evaluation—factors he was required to consider under the regulations—the ALJ also cited other reasons. *See* 20 C.F.R. § 416.927(c)(2)(i). The ALJ also noted contradictions based on Plaintiff's work history, his independence, and his deportment at the administrative hearing. Tr. 36. The ALJ determined that based on the record evidence, including the opinion of the consultative examiner, Plaintiff's allegations were not entirely consistent with the evidence. *Id.* The ALJ concluded:

> The claimant is admittedly not completely illiterate. He could pass a written driver's license test, use Facebook, and read and sign forms. (Hearing testimony and Exhibit 15F, page 4). He could use a smartphone and was considering using an app to help with weight loss. (Exhibit 13F, page 25). He had a history of skilled work. He could drive a car, shop, go to church, and watch informative and complicated television shows. He could learn and play complex video games such as Grand Theft Auto and an NFL game. He could live independently and help care for his child. (Hearing testimony). He could do errands for his grandfather. (Exhibit 4F). These are hardly the accomplishments of someone with functional illiteracy and severe deficits in adaptive functioning.

Tr. 36-37. The ALJ did note, however, that Plaintiff's learning difficulties required "some mental limitations and limitations on literacy skills." Tr. 37. The ALJ indicated that he considered all of the evidence in determining Plaintiff's residual functional capacity which included the following assessment:

> [Plaintiff] has sufficient concentration, persistence, and pace to understand, remember, and carry out simple, routine tasks in a low stress work environment (defined as being free of fast-paced or team-dependent production requirements),

involving simple work related decisions, occasional independent judgment skills, and occasional workplace changes; limited to jobs that require very little literacy skills.

Tr. 25. The court finds the ALJ used the appropriate standard in weighing Dr. Moody's opinion and gave "specific and legitimate" reasons for discounting the opinion. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (finding that "given the specific and legitimate reasons provided, the ALJ was permitted to reject the treating physician's opinion in its entirety").

### 2. Opinion of Treating Physicians

Plaintiff contends the ALJ erred in not giving proper weight to the opinion of his treating physician Dr. Robert LeBlond and to the opinion of Physician's Assistant ("PA") David Goldsmith. Pl.'s Br. 8. Defendant argues the "ALJ properly considered the opinions of Plaintiff's treating providers and gave the opinions some weight as supported by the evidence (Tr. 35-36)." Def.'s Br. 5.

If a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. § 416.927(c)(2)(providing treating source's opinion will be given controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d at 590 (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. § 416.927(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1)

whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005); 20 C.F.R. § 416.927(c). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (quoting *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d at 176. SSR 96-2p requires that an unfavorable decision contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence.

The Social Security Regulations distinguish between opinions from "acceptable medical sources" and "other sources." *See* 20 C.F.R. § 416.913(d).[7] Social Security Ruling 06–03p further discusses "other sources" as including both "medical sources who are not acceptable medical sources" and "non-medical sources." 2006 WL 2329939 (Aug. 9, 2006). Only acceptable medical sources can establish the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose opinions may be entitled to controlling weight. SSR 06–03p, 2006 WL 2329939 at *2. Physicians' assistants are considered "[m]edical sources who are not 'acceptable medical sources.'" *Id.* However, these non-acceptable medical sources may provide

---

[7] 20 C.F.R. § 416.913 was revised for claims filed on or after March 27, 2017. Because this claim

information "based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.*

Statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions, but rather, are administrative findings reserved for the Commissioner. SSR 96-5p, 1996 WL 374183 at *2 (July 2, 1996). "However, opinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner." *Id.* at *3.

a. Dr. Robert LeBlond

On April 6, 2016, Dr. LeBlond completed a Physical Questionnaire regarding Plaintiff's impairments and capabilities.[8] Tr. 366-67. Dr. LeBlond listed Plaintiff's diagnoses as chronic abdominal pain from diastasis recti and degenerative disc disease with back and leg pain. Tr. 366. His prognosis was that Plaintiff "may improve with treatment targeting obesity, spinal epidural [and] fitness." *Id.* Dr. LeBlond indicated that Plaintiff was not a malingerer. *Id.* The remaining questions related to Plaintiff's functional abilities and before responding to the questions Dr. LeBlond noted: "This [patient] has not worked in @ 10 years, therefore I have no objective info to assess these questions." *Id.* Dr. LeBlond then went on to answer the questions. Dr. LeBlond indicated that Plaintiff would "frequently" experience pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks during a typical workday. He indicated Plaintiff could walk 15 minutes without rest, sit for 30 minutes

_____

was filed by Plaintiff in 2014, the version cited herein is the appropriate version.

[8] The questionnaire is signed by PA Goldsmith for Dr. LeBlond. Tr. 367. It is unclear if the questionnaire was completed by PA Goldsmith or Dr. LeBlond, but because the ALJ considered it

before needing to get up, stand for 20 minutes before needing to sit down or walk around, and although he noted this response was "not measured" indicated Plaintiff could sit, stand/walk for less than 2 hours total in an 8-hour workday. *Id.* Dr. LeBlond indicated that Plaintiff could occasionally lift 10 pounds or less, rarely lift 20 pounds, and never lift 50 pounds. *Id.* He indicated that Plaintiff could occasionally twist, rarely stoop or crouch/squat, never climb ladders, and occasionally climb stairs. Tr. 367. Dr. LeBlond was "unable to estimate" the amount of time Plaintiff would likely be absent from work. He noted that Plaintiff would not need to elevate his legs with prolonged sitting and Plaintiff had no reported psychological conditions that affected his physical condition. *Id.* When asked to describe any other limitations that would affect Plaintiff's ability to work at a regular job on a sustained basis, Dr. LeBlond wrote:

(1) Academic deficiency: In special ed thru 8th grade, then drop[ped] out of school. Was successful in at least 2 work settings (1) flooring installation & (2) machine operator.

(2) Chronic pain on daily opioids. [Patient] is treatable with bariatric care, [physical therapy], spinal injections. While disabled currently he may be able to regain employment capabilities with more aggressive treatment targeting above issues.

(3) I would hesitate to make a permanent disability decision without the following: a) vocational assessment, b) more aggressive medical treatment as described above. Note [patient's] condition deteriorated after losing access to more aggressive/comprehensive medical care.

Tr. 367.

The ALJ considered Dr. LeBlond's opinion and found that "Dr. LeBlond['s] opinion openly admits it is speculative and not based on objective testing. Dr. LeBlond is admittedly not a vocational expert, and conclusions regarding disability are reserved solely to the Commissioner. (20 CFR 416.927(d) and SSR 96-5p). Thus, his opinion can only be given some weight." Tr. 36.

---

to be Dr. LeBlond's opinion the undersigned will as well.

b.    PA David Goldsmith

On April 29, 2014 Plaintiff was seen by PA Goldsmith for abdominal pain and for a letter.

Tr. 330. PA Goldsmith examined Plaintiff noting:

> Lower extremities showed good strength. DTR's [deep tendon reflex] equal. Sensation intact. Negative straight leg raise. Gait intact. Low back had fairly good range of motion. Mild tenderness along the paraspinals. Habitus shows truncal obesity. There is evidence of his diastasis recti in the upright position. It recedes back to below the surface in the supine position. There is tenderness to palpation over the midline of the abdomen.

*Id.* PA Goldsmith assessed Plaintiff with abdominal pain noting that the pain was stable. Tr. 331. He also noted that Plaintiff was "not suitable for any physically demanding jobs and apparently is considered untrainable due to being functionally illiterate." *Id.* He continued Plaintiff on his current medications and advised him to do home exercise as tolerated and encouraged a healthy lifestyle. *Id.* PA Goldsmith submitted a letter on April 30, 2014 addressed "To Whom It May Concern." Tr. 365. In it he noted that Plaintiff asked him "to write a letter on his behalf regarding his disability which ultimately creates the need for financial assistance or government aided programs such as food stamps and social security disability." *Id.* PA Goldsmith noted that Plaintiff entered care in April 2010 after a referral for treatment of chronic abdominal pain and that Plaintiff was "on a stable plateau in terms of pain and medical management." *Id.* He noted that Plaintiff was "independent for activities of daily living and does help to take care of his 13-year-old child along with his disabled wife." *Id.* PA Goldsmith concluded that Plaintiff was currently unable to work, and he believed that in Plaintiff's current condition he would be unable to return to the workforce. *Id.*

In a Progress Note dated April 7, 2016, PA Goldsmith indicated Plaintiff was being seen in the two-month follow-up for "chronic abdominal pain associated with diastasis recti, back pain with radicular symptoms into the legs, and request to complete forms for Social Security Disability." Tr.

459. In his assessment PA Goldsmith noted Plaintiff's report of constant abdominal pain and indicated that Plaintiff's increase in obesity was contributing to the poor pain control. Tr. 460. As to Plaintiff's back pain PA Goldsmith noted that Plaintiff was given a caudal epidural by Dr. LeBlond in February 2015 and Plaintiff stated that "he was doing fantastic and started working out a gym with a personal trainer three times a week." *Id.* Regarding his disability status PA Goldsmith indicated that Plaintiff would be "unable to return to work due to multiple issues including: 1) deconditioning, 2) lack of training, 3) chronic pain, 4) long-term investment in his application for Social Security Disability." *Id.* PA Goldsmith opined that repeating the caudal epidural could reduce Plaintiff's disability and if Plaintiff's obesity "could be sufficiently addressed, he may be able to go back to work." *Id.*

The ALJ noted that he considered PA Goldsmith's opinion "as an 'other source' opinion pursuant to SSR 96-8p and 06-03p" and gave the opinion some weight. Tr. 35. The ALJ noted that the "ultimate issue of determining disability is a finding reserved for the Commissioner." *Id.* The ALJ determined:

> These opinions do not make a function-by-function analysis of the claimant's abilities. Rather, Mr. Goldsmith made a conclusory statement that the claimant could not work. Mr. Goldsmith appears to be motivated to assist the claimant in receiving financial assistance. He is not a vocational expert and he admits that his opinion about the claimant's "illiteracy" is under-informed. Additionally, his opinions are slightly inconsistent and may have changed over time. At first, he said the claimant could not do "any physically demanding jobs" but in the same month said the claimant was "unable to return to the workforce". In 2016, he could not say with any certainty that the claimant was "unemployable". He is also somewhat misinformed, mentioning the claimant caring for his wife and daughter despite the fact that the claimant was not living with his wife in 2014. (Hearing testimony). Additionally, the tone of the 2016 note indicates that the claimant's historic lack of interest in pursuing retaining or less physically demanding work had contributed to his unemployed status. Additionally, Mr. Goldsmith suggests that the fact that the claimant had applied for Social Security Disability would be one reason why the claimant should not return to work. Mr. Goldsmith's opinion is admittedly speculative and not based on objective testing. Thus, while he was a treating source over a longitudinal period, his opinion can be given only some weight.

*Id.*

            c.      Discussion

Plaintiff argues that the opinions of these two treating providers are corroborated by Dr. Moody's evaluation. Pl.'s Br. 8. Plaintiff asserts that the ALJ contradicts himself by concluding that Plaintiff's pain is well controlled by medication but also noting frequent increases in the dosage of Plaintiff's pain medication because it was not controlling the pain. *Id.* Plaintiff contends that the "opinions of his treating physicians indicate that he is not functioning well due to chronic pain." *Id.*

The Commissioner argues that the ALJ properly considered the opinions of these treating providers and "gave the opinions some weight as supported by the evidence (Tr. 35-36)." Def.'s Br. 5. As to Dr. LeBlond's opinion the Commissioner notes "Dr. LeBlond's own admission that his assessment was not based on objective findings and the evidence shows medication helped with Plaintiff's pain . . . ." *Id.* at 7. As noted by the Commissioner, the record reflects evidence of Plaintiff's abdominal pain and treatment. Def.'s Br. 6-7. The ALJ duly considered Plaintiff's reports from 2010 through 2012 regarding his abdominal pain and increases to the dosages of pain medication. Tr. 30-31. Plaintiff cites this as evidence of a contradiction in the ALJ's assessment. However, these medical reports were made prior to Plaintiff's May 2014 application for SSI. The ALJ specifically noted that after Plaintiff's application date the medical reports indicated his abdominal pain was stable and controlled with medication. Tr. 31.

The responsibility for weighing evidence falls on the Commissioner, not the reviewing court. *See Craig v. Chater*, 76 F.3d at 589. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d at 176. "When, as here, an ALJ denies a claimant's application, the ALJ must state 'specific reasons for the weight given to the treating source's medical opinion,' to enable reviewing bodies to

identify clearly the reasons for the ALJ's decision." *Sharp v. Colvin*, 660 F. App'x 251, 257 (4th Cir. 2016). In *Sharp*, the Fourth Circuit determined that the "ALJ did not summarily conclude that [the doctor's] opinion merited little weight" because the ALJ explained why he discredited the opinion, remarking that the claimant's limitations were not supported by the doctor's office notes. *Id.* Here, as required by SSR 96-2p, the ALJ's decision contained specific reasons for the weight given to Dr. LeBlond's opinion—it was admittedly speculative, it was not based on objective testing, he admits to not being a vocational expert, and conclusions regarding disability are reserved solely to the Commissioner. Tr. 36.

Under the Social Security Regulations in force at the time of Plaintiff's application, PA Goldsmith is not an acceptable medical source for assessing Plaintiff's physical impairments. *See* 20 C.F.R. § 416.913. However, the ALJ evaluated his opinion and gave specific reasons for the weight given to the opinion. The ALJ noted that his opinions did not provide a function-by-function analysis, were slightly inconsistent, and like Dr. LeBlond's opinions they were admittedly speculative and not based on objective testing. The ALJ further noted that, like Dr. LeBlond, PA Goldsmith was not a vocational expert and the determination of disability was an issue reserved to the Commissioner. Tr. 35.

The court is not to weigh evidence or substitute its judgment for that of the Commissioner but is to determine whether the ALJ's weighing of the evidence is supported by substantial evidence in the record. *See generally Hays v. Sullivan*, 907 F.2d at 1456 (noting judicial review limited to determining whether findings supported by substantial evidence and whether correct law was applied). An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies,"

*Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion, *see* 20 C.F.R. § 404.1527(c).

The ALJ's reasons for discounting the treating providers' opinions are supported by substantial evidence. Accordingly, the court finds the ALJ did not err in not according the opinions controlling weight.

III.     Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig,* 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, it is hereby ORDERED that the Commissioner's decision be affirmed.

IT IS SO ORDERED.

February 20, 2019                                        Kaymani D. West
Florence, South Carolina                          United States Magistrate Judge